**Corina M. ZEUNER, Plaintiff,**

v.

**RARE HOSPITALITY INTERNATIONAL, INC., a/k/a Longhorn Steaks, Inc., Defendant.**

**No. 1:03 CV 00635.**

United States District Court, M.D. North Carolina.

Oct. 1, 2004.

Todd J. Combs, Morgan Herring Morgan Green Rosenblutt & Gill, High Point, NC, for Plaintiff.

Louis Whittier Doherty, Kilpatrick Stockton, L.L.P., Winston-Salem, NC, for Defendant.

### MEMORANDUM OPINION and ORDER

OSTEEN, District Judge.

Plaintiff Corina M. Zeuner ("Zeuner") brings this action against her former employer, Rare Hospitality International, Inc. ("Rare Hospitality"), alleging that her discharge was motivated by sex discrimination and pregnancy discrimination, and also alleging sexual harassment and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The matter is before the court on Defendant Rare Hospitality's Motion for Summary Judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

The following facts are presented in the light most favorable to Plaintiff.

Corina Zeuner, a woman, was one of three assistant managers at the LongHorn Steakhouse restaurant ("LongHorn") in High Point, North Carolina, from February 2000 until her discharge on January 31, 2003. (Def.'s Br. Support Mot. Summ. J. at 2.) LongHorn is owned and operated by Rare Hospitality. (*Id.*)

The hierarchy of authority at Rare Hospitality is well delineated. Zeuner, as assistant manager, oversaw restaurant operations but had no authority to discharge restaurant employees. (Zeuner Dep. at 25–26, 31.) During Zeuner's employment and the events at issue here, Zeuner reported to LongHorn's General Manager Patrick Plato. (*Id.* at 27.) Plato worked only at the High Point LongHorn, and he had authority to discharge hourly restaurant employees but not assistant managers. (Plato Dep. at 43, 56; Larson Dep. at 34.) Plato reported to Rare Hospitality's Regional Manager Chris Larson, and Larson reported to Regional Vice President John Alexander. (Plato Dep. at 53; Alexander Dep. at 9; Larson Dep. at 16.) Larson visited the LongHorn once every two weeks (Larson Dep. at 34), and Alexander visited the restaurant but generally worked elsewhere (Alexander Dep. at 11). The decision to terminate Zeuner's employment was made by Larson, Alexander, and Toni Jones,[1] a manager in Rare Hospi-

tality's human resources department in Atlanta. (Larson Dep. at 16; Alexander Dep. at 13, 44.)

During Zeuner's tenure at LongHorn, she was considered a good assistant manager. Her job evaluations showed the company was satisfied with her work, and she received a raise each year.[2] (Zeuner Dep. at 27–29, Ex. 7.) A few days prior to her termination, Zeuner was in "good standing" with the company. (Alexander Dep. at 78.) Approximately two weeks after Plaintiff's termination, General Manager Plato wrote a recommendation letter for Zeuner in which he praised her work, and added he had always felt the restaurant was in "good hands" with Zeuner running it. (Plato Dep. Ex. 2.)

Zeuner describes the working environment at LongHorn as "playful." (Zeuner Dep. at 56–57.) Problems began, however, when Gene Krawiec was hired in August 2002. Krawiec is around six feet tall and weighs approximately 300 pounds. (Plato Dep. at 57, Ex. 4 at 11, Ex 6.) Krawiec was originally hired as a cook, but later was moved at his request to a server position. (Zeuner Dep. at 57–58.) Most of the servers and hosts at LongHorn are women, while most of the kitchen employees are men. (Plato Dep. Ex. 4 at 11.)

LongHorn employees report that Krawiec's presence was negative in several respects. First, the record contains allegations of Krawiec's unwanted touching of the servers and hostesses. Benita Ziegler,

---

1. The record refers to Jones as "Toni Jones" and "Tony Jones." The court will refer to her as "Toni Jones."

2. Her evaluations show "scores" of 2.8 in May 2001, 2.55 in December 2001, 3.05 in May 2002, and 3.12 in December 2002. (Zeuner Dep. Ex. 7.) Performance evaluations give managers a score from 1 to 5, and 3 is considered a good score. (Plato Dep. at 10.) Zeuner's scores in the 2–3 range indicate she

was performing at an average level and similarly to other employees. (Larson Dep. at 65.) Zeuner was given annual raises and received her last raise on December 9, 2002, less than two months before her discharge. (Zeuner Dep. Ex. 7; Larson Dep. at 66.) In October 2001, she was given an award and a $100 bonus for being recognized by her employees as their best manager. (Zeuner Dep. at 28.)

a server, saw Krawiec "grope and grab servers and hostess staff," including one hostess who was a minor and who Krawiec "has cornered numerous times to grope over." (Plato Dep. Ex. 4 at 5.) Ziegler also saw him "pick up a server named Jenelle over his head holding her by the back and butt with her begging to please put her down." (*Id.*) Ziegler reports that Jenelle looked scared during this incident. (*Id.*) Shawn Earnhardt also saw Krawiec "pick up hosts or servers in between their legs and hold them over his head." (*Id.* at 12.) James Huckaby, a cook, saw Krawiec "smack numerous servers on the ass." (*Id.* at 7.) Margaret Price saw "his hands on more than one of [the female employees, especially the hostess staff]" and Stephanie Martin says he "seemed to find any way possible to put his hands on the women co-workers.... [H]e would put his hands on our waists, and run his hand around our back, or butt, or whatever he could touch." (*Id.* at 14, 26.) Mary Loflon, a hostess, witnessed Krawiec "hump many girls at the computer stations." (*Id.* at 30.) However, Krawiec never touched Plaintiff Zeuner in an inappropriate way. (Zeuner Dep. at 70.)

Second, the record is replete with vulgar comments attributed to Krawiec while at work. (Plato Dep. Ex. 4 at 11; Zeuner Dep. at 63.) There are numerous reports of Krawiec's statements to LongHorn employees about the size of his penis, sodomy with cats and dogs, and sex with young boys. (Plato Dep. Ex. 4 at 7, 8, 11, 14, 25, 28; Zeuner Dep. at 85–86.) Margaret Price says Krawiec spoke in a vulgar manner about "all the attractive women that may walk in .... He had insults for all, mostly the host staff, if they were attractive in any way he had sexual implications

for them." (Plato Dep. Ex. 4 at 14.) There are additional reports of statements directed at specific employees. Krawiec told a hostess named Kelly that he "would drink her bath water." (*Id.* at 7; Zeuner Dep. at 86.) Krawiec told Shawn Earnhardt he wanted to "fuck the hell out of you" and that he would give her "a 1/2 cup," referring to his semen. (Plato Dep. Ex. 4 at 11.) He also told some of the female employees that he wanted "to 'throw [you] against a wall and split you like a log.'" (*Id.*)

Third, Krawiec made threats of violence and engaged in acts of violence at the workplace. Notably, while Krawiec was still working in the kitchen, he was involved in an altercation with Plaintiff Zeuner over a time clock report when Krawiec punched the wall near Zeuner's head. (*Id.* at 7, 14; Zeuner Dep. at 59.) Zeuner reported this incident to Plato, but Plato took no official action.[3] (Zeuner Dep. at 62.) During an altercation with Benita Ziegler, Krawiec threatened to punch her and then struck an oven. (Plato Dep. Ex. 4 at 14, 25.) Krawiec told another employee, Day Coker, "he would give her a right cross." (*Id.* at 7, 25.) Krawiec threatened Wendy McCarter by saying, "You don't want to become my enemy because I will make your life hell." (*Id.* at 8.) He made a similar threat to Melissa Page. (*Id.* at 29.)

Lastly, Krawiec made repeated accusations of harassment and threatened to report employees for harassment. Andrew White reports that Krawiec described to him how to fake a sexual harassment complaint in order to get someone fired. (*Id.* at 24.) Krawiec told White he should wait until a manager was nearby, and then "say something like 'no I won't suck your fuck-

---

3. Plato gave Krawiec a verbal reprimand after this incident, but did not officially disci-

pline him in any way. (Plato Dep. at 42.)

ing dick' or 'quit hitting on me. I am not a faggot.'" (*Id.*) Krawiec added that if White "were to tell enough people [about alleged sexual harassment,] that they would eventually believe me and that I could get them to be a witness to something that never happened." (*Id.*) On his way out on the night of January 25, 2003, the last night that Krawiec worked at LongHorn, he stated that "he would have people's jobs before it was over with." (*Id.* at 10.) McCarter also reports that Krawiec said, "When I leave I will take a lot of people down with me." (*Id.* at 9.) Krawiec made no harassment report to the company until after his last shift at Long-Horn.

Plaintiff Zeuner reported Krawiec's conduct to Plato seven or more times, usually at the weekly manager's meeting, but Plato did not respond in any official way. (C. Zeuner[4] Aff. ¶¶ 8, 13; Cabrera Aff. ¶¶ 7–8.) Assistant Manager Nelson Cabrera confirms that Plato was aware of Krawiec's behavior, including specific incidents such as the altercation in which Krawiec punched a wall near Plaintiff's head. (Cabrera Aff. ¶ 5.) Zeuner says she heard Krawiec tell Plato "if you ever fire me I'll punch you in the mouth" and she believed that Plato was afraid of Krawiec. (Zeuner Aff. ¶¶ 6, 8.) After one of several altercations between Zeuner and Krawiec, Plato's advice to Zeuner in how to handle Krawiec was to avoid being "confrontational" with him. (Zeuner Dep. at 66.) Zeuner claims she repeatedly asked Plato to fire Krawiec. (*Id.* at 127.) Zeuner does not recall whether she ever spoke with Chris Larson about Krawiec's behavior before January 25, 2003. (*Id.* at 70.) Larson says neither Zeuner nor Plato reported any of Krawiec's alleged sexual harassment to her. (Larson Dep. at 64, 81.)

In December 2002, Plaintiff learned she was pregnant and informed General Manager Plato. (Plato Dep. at 32–33.) Larson learned of the pregnancy in December 2002, and informed Alexander. (Larson Dep. at 23; Alexander Dep. at 29.) In January 2003, Zeuner confirmed an August due date. (Zeuner Dep. at 103.) Had Zeuner's baby been born on time, she would have been on maternity leave during the October 2003 International Home Furnishings Market ("Furniture Market").[5] (Compl. ¶ 17.) Larson admits that she discussed the pregnancy with Plato and that the two of them "joked about the need for [Zeuner] to be back in time for furniture market." (Larson Dep. at 25.) Larson stated to Plato that Zeuner should hurry up and have her baby in time to return for Furniture Market. (*Id.* at 21.) Larson previously had made a similar comment about the pregnancy of another LongHorn employee, Wendy McCarter. (*Id.* at 21.)

Events culminated on Saturday night, January 25, 2003, when Krawiec was working as a server and Zeuner was the assistant manager on duty. As the shift was winding down, Krawiec realized he had not been "cut" when he thought he should have been. "Cutting" a server means the server will get no more new tables during the shift and may begin the various tasks that must be completed before the shift ends. (Zeuner Dep. at 78.) That night

---

4. There are affidavits in the record from Corina Zeuner, the plaintiff, and from Tony Zeuner, her husband. These affidavits will be designated "C. Zeuner" and "T. Zeuner," respectively.

5. High Point, North Carolina, hosts this event twice each year in April and October. The event increases the restaurant's sales by 50–100% for about two weeks. (Plato Dep. at 35–36.) Because of the large increase in customer volume, the company preferred to staff five assistant managers at the High Point LongHorn, rather than the usual three. (Plato Dep. at 35.)

hostess Patricia Baxley made the schedule cuts, subject to Plaintiff Zeuner's instructions. (Plato Dep. Ex. 4 at 20; Zeuner Dep. at 78.) Krawiec was apparently angry about this, because Margaret Price reports that Krawiec was "stomping around cussing and throwing bread boards talking about how dumb it was that he had to be there and not cut." (Plato Dep. Ex. 4 at 16.)

Krawiec approached Baxley in the front host area and "became hostile" with her. (*Id.* at 20.) Wendy McCarter describes that Krawiec "was yelling at [Baxley] and had her cornered into the hostess stand." (*Id.* at 9.) Margaret Price indicates that she could hear Krawiec's specific comment to Baxley to the effect that she should "get a step [ladder] to kiss his ass," and she was concerned that customers may have been able to hear Krawiec's statements. (*Id.* at 16.) Melissa Page reports that Krawiec "put his finger in [Baxley's] face" and told her to "drop dead," and that he did this "in the presence of customers." (*Id.* at 29.) There were three or four tables of customers in the restaurant who could have heard these statements. (Zeuner Dep. at 83.) Baxley went to Plaintiff Zeuner in the server area and asked for her help to "please get [Krawiec] off of me." (Plato Dep. Ex. 4 at 20.) Zeuner confronted Krawiec and a verbal altercation ensued. Krawiec accused Zeuner of lying and harassment and said he would call Regional Manager Larson to report it. (*Id.* at 10.) Zeuner later apologized to several customers who had witnessed the scene. (Zeuner Dep. at 84.)

Zeuner contacted Plato that evening about the events, and Plato's initial assessment was that Krawiec had "crossed the line and he was going to get terminated."

(Plato Dep. at 47.) John Alexander confirms that the incident could have been sufficient grounds to fire Krawiec. (Alexander Dep. at 34.) That evening, Zeuner, Benita Ziegler, and Patricia Baxley told Plato they refused to continue working with Krawiec. (C. Zeuner Aff. ¶ 15.)

On the following Monday, Krawiec faxed a letter to Toni Jones in Rare Hospitality's human resources department, in Atlanta, in which he accused Zeuner of sexual harassment. (Zeuner Dep. Ex. 3.) Because of these accusations, Krawiec was not terminated, but was suspended pending further investigation. (Plato Dep. at 25, 50–52; Larson Dep. at 73.) The order to suspend rather than terminate Krawiec came from John Alexander and the corporate office in Atlanta. (Alexander Dep. at 40.) Zeuner was put on paid leave during the investigation. (Zeuner Dep. at 38–39.) The outcome of the investigation was a decision to fire Zeuner and continue Krawiec's employment. (Larson Dep. at 30.) Zeuner was fired on January 31, 2003. (Plato Dep. Ex. 1.) Krawiec was transferred to a Greensboro location and resigned after two weeks.[6] (Plato Dep. at 56–57.)

In making its termination decision, Rare Hospitality relied on the allegations and statements made by Krawiec in his letter, as well as on corroborating statements by LongHorn employees Louisa Snyder, Joe Sexton, and Jennifer Hawes. (Larson Dep. at 56.) The company's memorandum to Zeuner on the day of her termination states three grounds for its decision: (1) "[f]ailing to take action on a sexual harassment complaint"; (2) "[g]rabbing an employee's genitals"; and (3) "[e]xposing your breast to employees." (Plato Dep.

---

6. Alexander indicates that an investigation into Krawiec's conduct was not conducted because Krawiec either failed to show up or resigned before starting at the Greensboro restaurant. (Alexander Dep. at 41.)

Ex. 1.) Louisa Snyder reported an incident of sexual harassment to Zeuner about a co-worker and asserts Zeuner "did not take it seriously and instead told me that this was just how this co-worker played." (Snyder Aff. ¶ 11; *see also* Zeuner Dep. Ex. 13.) Joe Sexton saw Zeuner "grab Gene [Krawiec] in his genitals [sic] area at the Long-Horn Steakhouse restaurant." (Sexton Aff. ¶ 2; *see also* Zeuner Dep. Ex. 12.) Snyder witnessed Zeuner expose her breast to her and another employee James Huckaby. (Snyder Aff. ¶ 11; Zeuner Dep. Ex. 13.) Although not relied on by Rare Hospitality, Jennifer Hawes states that Zeuner gave employees "playful swat[s]" and "[s]omewhere along the way touching breasts was added into it." (Jones Aff. Ex. B.) Hawes adds, "Occasionally it would lead to her taking a person's hand and placing it on her chest." (*Id.*) Zeuner submitted her own statement on these matters. (Jones Aff. ¶ 7, Ex. C.) Zeuner admits to "slapping" some female employees on their buttocks. (Zeuner Dep. at 72.) However, Zeuner denied all other allegations. (*Id.* at 51–55, 72–77, 139; Zeuner Aff. ¶ 20.)

Zeuner contends that the decision to terminate her on the grounds of sexual harassment was sex discrimination, because other managers had also been accused of sexual harassment but were allowed to keep their jobs. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 14.) Both Larson and Plato have been so accused. Six years ago, Chris Larson wrote several "love letters" to a LongHorn employee named Kim Traver [7] describing Larson's feelings of attraction and infatuation with Traver. (Larson Dep. at 39.) Larson sent these letters, as well as flowers, to Traver at work. (*Id.* at 40.) Larson also asked Traver out on dates two or three times. (*Id.* at 42.) Although Larson did not feel these actions constituted sexual harassment, she does admit that this was inappropriate. (*Id.* at 39.) Larson admits also that had a relationship developed with Traver, they would have been in violation of Rare Hospitality's company policy.[8] (*Id.* at 42.) In the Fall of 2003, Bill Thomas, an assistant manager at Rare Hospitality's Greensboro restaurant where Traver was working at the time, reported this conduct to John Alexander. (Alexander Dep. at 55, 63–64.) Alexander contacted Traver to follow up on the report, and Traver indicated to Alexander that she was uncomfortable with the investigation and that Larson had made no advances since 1998. (*Id.* at 61.) Alexander also contacted Larson, who indicated she and Traver had, in Alexander's words, a "good working relationship." (*Id.* at 62.) Alexander took no disciplinary action against Larson. (*Id.* at 64.)

An informal charge of sexual harassment was made against Patrick Plato by a LongHorn employee named Kelly Tucker. (Larson Dep. at 75; Plato Dep. Ex. 4 at 23.) Larson investigated this charge, but there were no witnesses to the incident besides Tucker and Plato. (Larson Dep. at 75.) According to Larson, Tucker accused Plato of making an inappropriate reference to how Tucker looked in a Halloween costume, and said the comment made her uncomfortable. Tucker also claimed that Plato told her he wanted to take a server on vacation with him. (*Id.* at 76.) Tucker did not want to file any formal charges. (*Id.* at 75.) Larson did not

---

7. Alexander's deposition refers to her as Kim "Trabor." (Alexander Dep. at 54.) The court will refer to her as Kim "Traver."

8. Company policy required a transfer if a romantic relationship developed between two employees, and Larson indicates that if Traver had accepted her advances she would have resigned her position. (Larson Dep. at 42.)

find this to be actionable sexual harassment under the company's policy and made no official report. (*Id.* at 76–77.) Alexander learned of Tucker's claims either from Larson or from Toni Jones. (Alexander Dep. at 49.) Tucker resigned from the High Point restaurant and later returned to work for a company-owned LongHorn restaurant in Greensboro. (Larson Dep. at 75–77; Plato Dep. Ex. 4.)

A few days after her discharge on January 31, 2003, Zeuner filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Zeuner Dep. Ex. 8.) The EEOC issued her a right-to-sue letter on March 31, and this action was timely filed thereafter. (Compl.¶ 6.)

## II. DISCUSSION

Rare Hospitality in its Motion for Summary Judgment argues that it should prevail as a matter of law on the four claims brought by Plaintiff Zeuner. These four claims will be discussed separately: sex discrimination, pregnancy discrimination, sexual harassment, and retaliation.

### A. Standard of Review

Summary judgment is appropriate when the pleadings and other submissions, viewed in the light most favorable to the plaintiff, show that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The basic question in a summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A court "must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.,* 372 F.3d 662, 667 (4th Cir.2004) (citing *Thompson v. Aluminum Co. of Am.,* 276 F.3d 651, 656 (4th Cir.2002)).

If the nonmoving party fails to make a sufficient showing to establish an essential element of its case, summary judgment is proper because a "complete failure of proof" on an essential element "renders all other facts immaterial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. While the court "must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996) (citing *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir. 1987)).

### B. Sex Discrimination

Under Title VII, "to discharge any individual ... because of such individual's ... sex" constitutes an "unlawful employment practice." 42 U.S.C. § 2000e–2(a)(1). A Title VII plaintiff must prove that her discharge was motivated by her sex.

When a Title VII plaintiff has no direct evidence of discrimination, she can create an inference of discrimination by making out a circumstantial case under the scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To succeed, a Title VII plaintiff must establish a prima facie case of discrimination by showing (1) she is a member of a protected class; (2) she suffered some adverse employment action; (3) at the time of the adverse employment action, her job performance met her employer's legitimate expectations; and (4) the position re-

mained open or was filled by someone outside her protected class. *Id.* (acknowledging that the components of the test will vary with different applications of Title VII); *see also McKiver v. General Electric Co.,* 11 F.Supp.2d 755, 758 (M.D.N.C.1997).

■ If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Id.* This is a burden of production, not persuasion, and no credibility assessment can be made. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993).

If the employer's burden of production is met, the "presumption of discrimination drops out of the picture," and the plaintiff must prove that the legitimate, nondiscriminatory reasons offered by the employer were merely a "pretext" for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (citations omitted). That is, the plaintiff may show by a preponderance of the evidence that the employer's proffered reason is "unworthy of credence" and she was the victim of intentional discrimination. *Id.* At this point, the plaintiff's burden of demonstrating pretext merges with the burden of persuasion on the existence of intentional discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir. 2004), *pet. for cert. filed,* 72 U.S.L.W. 3673 (U.S. Apr. 5, 2004) (No. 03–1443) (citing *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

■ A plaintiff can make this showing by proving that disciplinary measures, although based on legitimate grounds, were applied in a discriminatory manner. In *McDonnell Douglas,* a case brought to remedy racial discrimination, the Court found "[e]specially relevant" to a showing of pretext that employees outside the plaintiff's protected class were hired while the plaintiff was not, even though all had engaged in acts "of comparable seriousness." 411 U.S. at 804, 93 S.Ct. at 1825. An employer is only justified in making adverse employment decisions based on an employee's bad acts so long as it applies this criterion " 'alike to members of all races.' " *McDonald v. Santa Fe Trail Trans. Co.,* 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976) (quoting *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825). This reasoning applies with equal force to cases of sex discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 244 n. 9, 109 S.Ct. 1775, 1787 n. 9, 104 L.Ed.2d 268 (1989) (Title VII "on its face treats each of the enumerated categories exactly the same.")

Although the *McDonnell Douglas* regime involves alternating burdens on the parties, the " 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 143, 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

■ Rare Hospitality argues that it is entitled to summary judgment on Zeuner's claim of sex discrimination because she cannot show at the time of her termination she was meeting its legitimate expectations, or alternatively, because it had a legitimate, nondiscriminatory reason to terminate her employment. (Def.'s Br. Support Mot. Summ. J. at 11–16.) In response, Zeuner points to evidence in the record that she did in fact perform her job duties to a satisfactory level and that Rare Hospitality's proffered, nondiscriminatory reason for the termination decision was a pretext for intentional sex discrimination.

(Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 12–17.) For the reasons set forth below, Defendant's summary judgment motion on this claim will be denied.

Plaintiff Zeuner has met all of the elements of a prima facie case, including a sufficient showing that at the time of her termination her performance met the employer's legitimate expectations. It is not disputed that Zeuner, a woman, was fired from her job and subsequently replaced by a man. Zeuner was temporarily replaced by several male assistant managers from other locations (Plato Dep. at 26, 30), and then permanently replaced by a male assistant manager (Larson Dep. at 20).

In addition, Zeuner has produced evidence that she was performing her job adequately. Her performance evaluations show that she consistently received scores considered "good" or "average." She received regular salary raises, the last one received less than two months before her termination. In addition, Plato and Larson, the only two managers with direct supervision over Zeuner, indicate that until the few days before her termination, they had positive opinions of her and the quality of her work. Larson states that when Krawiec's allegations against Zeuner first came to light on January 28, she did not believe them because Zeuner had always been a "capable and credible manager." (*Id.* at 37.) Plato wrote Zeuner a job recommendation letter two weeks after she was terminated by Rare Hospitality in which he praised her work. (Plato Dep. Ex. 2.) This is sufficient evidence that, until the events contested in this case occurred, Rare Hospitality was satisfied with Zeuner's performance. Thus, Zeuner has established a prima facie case under the *McDonnell Douglas* framework. *See also Bass v. E.I. Dupont De Nemours & Co.*, 324 F.3d 761, 766 n. 1 (4th Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 301, 157 L.Ed.2d 253 (2003) (stating that evidence of promotion, salary raises, and notice of satisfactory performance is enough to establish this element in a prima facie case).

Rare Hospitality has also met its burden of production in offering a legitimate, nondiscriminatory reason for its termination of Zeuner. Rare Hospitality stated to Zeuner at the time of her termination that its decision was based on Krawiec's corroborated claims of sexual harassment and her failure to report sexual harassment. (Zeuner Dep. Ex. 5.) Rare Hospitality continues to assert these grounds for its decision. (Def.'s Br. Support Mot. Summ. J. at 15.) Zeuner's alleged violation of Title VII qualifies as a legitimate, nondiscriminatory reason for her termination. Indeed, even she admitted such actions, if true, were grounds for termination. (Zeuner Dep. at 139.) Thus, Rare Hospitality has met its burden, and the inference of discrimination created by Zeuner's prima facie case "drops out of the picture." *See Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106.

In rebuttal to Rare Hospitality's proffered nondiscriminatory grounds for decision, Zeuner argues that the company's stated reasons are a pretext for sex discrimination. First, Zeuner argues that reports of sexual harassment by LongHorn managers were treated inconsistently. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 14.) Specifically, Larson and Plato had been accused of sexual harassment, but no formal disciplinary action had been taken against them by the company. Plato is male, and Zeuner and Larson are female. Although Zeuner was treated differently than Plato, she was also treated differently than Larson, another female manager. The distinction in the harassment claims against these three managers is in the sex of the *victim* and not the harasser. Since Title VII outlaws the discharge of an indi-

vidual because of "such individual's ... sex," 42 U.S.C. § 2000e–2(a)(1), Zeuner must show that this inconsistency was a result of sex discrimination or sex stereotyping against *her*. More specifically, Zeuner must show that the company did not enforce its policy against managers who made sexual advances against or were sexually aggressive with women, but did enforce it against managers who engaged in the same conduct against men, and that this inconsistency was based on stereotypical notions about *the manager*, not the victim. *See Price Waterhouse*, 490 U.S. at 251, 109 S.Ct. at 1791 (holding that discrimination based on sex stereotyping is actionable under Title VII). She also "must show that the employer actually relied on her gender in making its decision." *Id.* The only evidence Zeuner has advanced to support this is the fact of the inconsistency itself.

As a second argument showing "pretext," Zeuner contends Rare Hospitality did not believe its own reasons for terminating Zeuner's employment. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 15.) In essence, Zeuner argues that in light of the evidence Rare Hospitality had before it (the statements produced by Larson's investigation into Krawiec's claims, along with evidence of her positive history with the company and Krawiec's negative history), it was implausible for Rare Hospitality to believe Krawiec's allegations. Therefore, it must have known it was not making a legitimate decision.[9]

Rare Hospitality contends that all of its decision makers believed the corroborated allegations and found them to be good cause for Zeuner's termination. Alexander confirms his belief that Zeuner should have been terminated based on the facts revealed in Larson's investigation. (Alexander Dep. at 13.) Jones was persuaded by Krawiec's explicit descriptions and corroborating witnesses and states she had no reason to doubt the information forwarded to her by Larson. (Jones Aff. ¶ 12.) However, neither Alexander nor Jones participated in the employee interviews, and both relied entirely on Larson's report. (*See* Alexander Dep. at 43; Jones Aff. ¶¶ 9–12.)

Plato and Larson, the only managers who regularly worked at or visited the restaurant, both admit, at least in the beginning, they did not find Krawiec's allegations credible. (*See* Plato Dep. at 25 (stating he initially believed Krawiec was lying); Larson Aff. ¶ 20 (saying her "initial impression ... was that [Krawiec's] allegations were made up by a disgruntled employee").) Larson also admits that Krawiec's claims were exaggerated and several of his allegations eventually proved to be unfounded. (Larson Dep. at 63.) However, after speaking with Snyder, Sexton, and Hawes, Larson became "persuaded that at least some of the very serious allegations that Gene [Krawiec] had raised against Corina [Zeuner] were in fact true." (Larson Aff. ¶ 20.)

Larson, who conducted the investigation almost entirely on her own, does not appear to have taken all employees' statements at face value. Larson's notes show that she discounted the statements of

---

9. This is a delicate argument for Zeuner to make. The court will not consider evidence that Rare Hospitality simply made a bad decision, so long as it was not based on prohibited discrimination. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.") (citations omitted). Zeuner must be careful to argue that the decision makers at Rare Hospitality did not believe their stated reasons, or that their desire to discriminate affected their judgment.

Krawiec's girlfriend, Sunshine Carter, describing them as an "[i]dentical, word-for-word version to [Krawiec's] about Saturday night, although [Carter] was behind the bar." (Plato Dep. Ex. 6; Larson Dep. at 59.) Also, Larson indicates some hesitancy to believe Louisa Snyder, citing Plato's concern about inconsistency in her statements and a possible connection with Sunshine Carter.[10] (Plato Dep. Ex. 6.) As described above, Snyder told Larson she witnessed Zeuner expose her breast to her and James Huckaby. Huckaby was not interviewed by Larson (there is no record in her investigation notes) and he denies that this incident took place.[11] (Huckaby Aff. ¶ 3.) Zeuner also contends that Larson had cause to doubt the statements of Joe Sexton, another of Krawiec's corroborating witnesses, because Sexton and Krawiec were friends. (Zeuner Aff. ¶ 20.) Larson says if she had believed the corroborating employees were friends with Krawiec, she would have investigated further. (Larson Dep. at 57.) Larson seems to indicate she had no knowledge of any friendship between Krawiec and Sexton, or any other reason to believe Sexton would lie about Zeuner. (*Id.* at 56–57.)

Although Plato did not participate in the decision to terminate Zeuner, his opinions were available to Larson, and she made note of his opinion in reference to Louisa Snyder. (*See* Plato Dep. Ex. 6.) In deposition testimony, Plato says he believed Krawiec's allegations against Zeuner were true (Plato Dep. at 14), but when asked about the specific allegations, his answers were somewhat equivocal. Plato believed that Zeuner was told by an employee of sexual harassment and failed to take action on that allegation. (*Id.* at 15.) This employee was Louisa Snyder, whose statements Plato had questioned at the time of Larson's investigation. (*See supra*, n. 10.) When asked whether he believed Zeuner had "grabbed an employee's genitals," Plato's first response was only to reiterate that witnesses had corroborated the story, and, when pressed further, he answered, "I'm not sure." (Plato Dep. at 15.)

The record does not indicate what information, if short of what it actually used, would have been the minimum required for Rare Hospitality to terminate Zeuner. At least, the evidence of allegations against Plato and Larson by other employ-

**10.** Plato appears to have questioned Snyder's allegation that Zeuner failed to report an incident of sexual harassment by a kitchen employee named Heriberto. Larson writes:

Patrick [Plato] doesn't know whether Louisa is credible on this or not. His only concern is: He asked her a couple of days ago about the incident with Heriberto in the walk-in, asking her why she hadn't brought it up to him if she was so concerned about it. There appears to be a connection between Louisa and Sunshine (they are both bartenders).

(Plato Dep. Ex. 6.) One LongHorn employee reports that Snyder was a bridesmaid in Krawiec's wedding. (McCarter Aff. ¶ 6.)

**11.** Zeuner has also presented evidence that Snyder has changed her story since Larson's investigation. Zeuner includes a statement signed by Snyder and dated March 1, 2003 (more than a month after Larson's investiga-

tion), in which she says Zeuner had "taken care of" her sexual harassment complaint by reprimanding the offending employee directly, and says she told Zeuner of the incident "in passing." (Plato Dep. Ex. 4 at 21.) Snyder also says she never witnessed the incident in which Zeuner exposed her breast, but had only been told about it afterwards by someone else, and that she was "persuaded [by Larson] to give a statement against my wishes." (*Id.*) Rare Hospitality presents Snyder's signed affidavit, dated February 4, 2004, in which Snyder reaffirms her original story and says Zeuner pressured her into signing the March 2003 retraction, which Zeuner herself wrote. (Snyder Aff. ¶¶ 9–10.) All of this took place *after* Larson's investigation and Rare Hospitality's decision. Therefore, it is irrelevant to whether Larson believed Snyder's story at the time.

ees challenges the notion that all violations of company policy would result in automatic termination. Zeuner has not presented evidence on whether Larson doubted Hawes' statement,[12] but Hawes' allegations were not cited as grounds for Zeuner's termination. (Plato Dep. Ex. 1.) Zeuner has presented sufficient evidence to show that Larson and Plato may have doubted Snyder, who provided the only corroboration of two of the three incidents cited for Zeuner's termination (failing to report sexual harassment and exposing her breast). (*Id.*) It remains unclear whether Rare Hospitality would have considered the presence of fewer corroborated allegations to be sufficient grounds for Zeuner's termination. Thus, an unresolved issue of fact remains regarding Rare Hospitality's motivations.

On balance, Zeuner has presented enough evidence of pretext to survive summary judgment. A jury could find that the company's inconsistent enforcement of its sexual harassment policy, along with the evidence that Larson and Plato had some cause to doubt the legitimacy of Krawiec and at least some of his corroborating witnesses, instills enough doubt in this employer's nondiscriminatory reason to render it "unworthy of credence." A jury could also find, based on Zeuner's prima facie case and her evidence of pretext, that the company was at least partially motivated by sex discrimination in its decision. *See Reeves,* 530 U.S. at 148, 120 S.Ct. at 2109 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2155,

156 L.Ed.2d 84 (2003) (holding that where the plaintiff proceeds under a "mixed motives" theory, the plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that ... 'sex ... was a motivating factor'" in the employment decision) (quoting 42 U.S.C. § 2000e–2(m)). For these reasons, the Defendant's Motion for Summary Judgment on the sex discrimination claim will be denied.

## C. Pregnancy Discrimination

Zeuner next alleges that Rare Hospitality discriminated against her based on her pregnancy. Rare Hospitality makes the same arguments for summary judgment regarding this claim as the sex discrimination claim: Zeuner was not meeting its legitimate expectations at the time of her discharge, or alternatively, Rare Hospitality had a legitimate nondiscriminatory reason for her termination. (Def.'s Br. Support Mot. Summ. J. at 11–16.) Zeuner responds by pointing to evidence in the record that she argues constitute direct evidence of discrimination based on pregnancy. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 10–12.)

Under Title VII, discrimination based on pregnancy is a type of sex discrimination and is analyzed under the same *McDonnell Douglas* scheme used for sex discrimination. *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 297 (4th Cir.1998). The difference is that the plaintiff must show she was discriminated against because of her pregnancy, rather than because of sex. *See id.* A plaintiff must provide enough evidence upon which a reasonable jury could find that the termination decision was actually motivated by the pregnancy. *Hill,* 354 F.3d at 286.

**12.** Zeuner shows that Hawes was initially unwilling to put her corroboration in writing and was pressured into writing it down. (*See* Plato Dep. Ex. 4.) This is irrelevant to whether her corroboration is accurate or to whether Larson believed it.

Rare Hospitality's first argument is that Zeuner was not meeting its legitimate expectations at the time of her discharge. The court's discussion on this issue regarding Zeuner's sex discrimination claim adequately describes why Defendant's argument for Zeuner's pregnancy claim should be rejected. Zeuner's evidence is enough for a jury to conclude that Rare Hospitality was satisfied with her work until the disputed events took place. Rare Hospitality's second argument is that it had a legitimate, nondiscriminatory reason to terminate Zeuner. Again, the court's discussion regarding Zeuner's sex discrimination claim adequately articulates why Rare Hospitality has met its burden here.

The remaining issue is whether Zeuner has put forth sufficient evidence of pretext. Zeuner points to two facts to support this claim: (1) a statement made by Plato and Larson about her pregnancy and (2) the timing of the events. First, Plato admits he told Zeuner that she needed to "hurry up and have her baby" before the October Furniture Market. (Plato Dep. at 32.) Larson also admits to making this statement to Plato about Zeuner, and to having made a similar comment about Wendy McCarter's pregnancy. (Larson Dep. at 21–22.) This is the only comment about her pregnancy of which Zeuner is aware. (Zeuner Dep. at 134–35.) Larson and Plato both counter that this comment was meant as a joke, and could not have been taken seriously because it is obvious no one could control such timing. (Plato Dep. at 32; Larson Dep. at 25.) Second, Larson and Plato learned of Zeuner's pregnancy in December 2002, and she was fired on January 31, 2003. (Larson Dep. at 23; Plato Dep. at 33.) Zeuner argues the proximity in timing is circumstantial evidence of pregnancy discrimination. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 12.)

A reasonable jury could believe that Plato and Larson were joking when they said Zeuner should hurry up with her pregnancy to return in time for the October Furniture Market. Their claim is bolstered by the existence of a second Furniture Market in April, just a couple of months after Zeuner was terminated. However, this claim turns in large part on the credibility of Plato and Larson, and credibility determinations cannot be resolved in a summary judgment motion. *Williams,* 372 F.3d at 667 (citations omitted). Because an issue of fact remains as to Defendant's motivations, the Motion for Summary Judgment will be denied as to Plaintiff's pregnancy discrimination claim.

### D. Sexual Harassment

Zeuner alleges Krawiec created a hostile work environment and Rare Hospitality, as his employer, is liable to her under Title VII for failing to properly address her complaints. (Compl. ¶¶ 30–35.) Rare Hospitality argues it is entitled to summary judgment on this claim, first, because Zeuner did not subjectively perceive Krawiec's behavior as offensive to her, and, second, because Rare Hospitality did not know of any possible sexual harassment and Plaintiff failed to avail herself of the company's harassment policy. (Def.'s Br. Support Mot. Summ. J. at 16–20.)

Title VII prohibits sex discrimination "with respect to [an individual's] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). A hostile or abusive work environment is actionable under Title VII if it is severe or pervasive enough to alter the terms, conditions, or privileges of employment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). To prevail on a hostile work environment claim, a plaintiff must show the following: (1) she was subjected

to unwelcome conduct; (2) the alleged harasser engaged in this conduct "because of" her gender; (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment; and (4) there is some basis to impute liability to the employer. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001). The first two prongs are undisputed in this case.

■ To satisfy the third prong of a claim, the conduct must be sufficiently severe or pervasive to alter the conditions of employment. To be actionable, the conduct must be both objectively and subjectively offensive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). First, the conduct must create "an environment that a reasonable person would find hostile or abusive" or it lies "beyond Title VII's purview." *Id.* Second, the plaintiff must "subjectively perceive the environment to be abusive" before it can be said to have "altered the conditions of [her] employment." *Id.* "[N]o single factor is required" in determining "whether the plaintiff actually found the environment abusive." *Id.*, 510 U.S. at 23, 114 S.Ct. at 371.

■ To satisfy the fourth prong of the claim, a plaintiff must allege enough facts to show why the employer should be held liable for the acts of its employee. In a situation where the alleged harasser is not a supervisor and has no authority over the plaintiff, the standard of liability is negligence. *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir.1999). To prove an employer's negligence in a hostile work environment claim, the plaintiff must show the employer "knew or should have known about the conduct and failed to stop it." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 2267, 141 L.Ed.2d 633 (1998). "Knowledge of work

place misconduct may be imputed to an employer by circumstantial evidence if the conduct is shown to be sufficiently pervasive or repetitive so that a reasonable employer, intent on complying with Title VII, would be aware of the conduct." *Spicer v. Virginia Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir.1995).

Here, Rare Hospitality argues that Zeuner has failed to establish the third and fourth prongs of a hostile work environment claim. First, she fails to establish the third prong because she did not subjectively find Kraweic's behavior to be offensive. Defendant points to several facts: (1) neither Zeuner nor any other employee complained to Larson or to the company's human resources department; (2) she did not use the term "sexual harassment" in her complaints to Plato or in her e-mail to Toni Jones about the events of January 25; (3) her EEOC charge did not allege sexual harassment; (4) she was never inappropriately touched by Krawiec; and (5) she stated in her deposition "[a]t the time, I didn't put a whole lot of thought into [whether Krawiec's behavior was sexual harassment]" (Zeuner Dep. at 72.). (Def.'s Br. Support Mot. Summ. J. at 17–18.)

■ Taken either separately or as a whole, this information does not negate Zeuner's subjective belief that Krawiec's behavior created a hostile and abusive work environment. An employee's use of a sexual harassment reporting policy may be relevant to the employer's knowledge of offending behavior, but it is irrelevant to the employee's belief as to whether she is, in fact, being sexually harassed. Second, an employee need not use specific terms, especially legal terms, to establish that a violation of Title VII actually occurred. Also, the context of Zeuner's e-mail to Jones indicate she may have limited her complaint to the events of January

25 and similar occurrences. She begins her January 29 e-mail to Jones by introducing it as a description of "the events in detail leading up to and including Saturday the 25th of January" and describes the January 25 incident and other specific arguments between them, including the time clock incident. (Jones Aff. Ex. C.) Third, Defendant's contention that Zeuner did not allege sexual harassment in her EEOC filing is untrue. Zeuner's EEOC filing alleges Krawiec was "derogatory" toward women and created a "hostile working environment." (Zeuner Dep. Exs. 8–9.) A claim of a hostile working environment is a type of sexual harassment claim, and the use of a negative word like "derogatory" shows she found the remarks offensive. Fourth, there is no requirement that a plaintiff be subjected to all aspects of an alleged harasser's offensive conduct. Zeuner's claim is based on other aspects of Krawiec's behavior, such as his threats and vulgar comments. Finally, the fact that an employee did not think of behavior as a violation of her civil rights until after her termination does not establish that she was not offended by it.

 On the contrary, Zeuner has adduced sufficient evidence that she perceived Krawiec's behavior to be offensive. Although he never inappropriately touched Zeuner the way he is alleged to have touched other employees (Zeuner Dep. at 70), Zeuner was subjected to the same threatening conduct and vulgar remarks that other employees report. She describes his vulgar statements as "verbal abuse" and says he "made rude remarks about women all the time." (C. Zeuner Aff. ¶ 4.) Zeuner "felt threatened" after Krawiec punched the wall near her head. (Zeuner Dep. at 59.) She describes his remarks as "sexual or hostile" and as "very rude, lewd comments." (Id. at 63.) In reference to his remarks and his violent conduct, she says she was in a "situation where I did not want to confront Gene [Krawiec] because I felt threatened by him." (Id. at 63.) She says, "I completely avoided him, like the plague." (Id. at 70.) As a whole, Zeuner puts forth sufficient evidence on which a jury could find she was offended by Krawiec's behavior and subjectively perceived the working environment at LongHorn to be hostile or abusive.

Rare Hospitality next argues that Zeuner has failed to establish the fourth prong of a hostile work environment claim because it did not know of Krawiec's behavior and no harassment was ever reported. The company's Management Handbook includes a section called "Harassment Policy" with these directions: "All complaints of harassment should be reported to a store manager, your Regional Manager, or the *Human Resources Department [number provided].*" (Zeuner Dep. Ex. 1 at 24–25.) Two paragraphs down, it lists a bold heading titled "Complaints of Harassment" and provides "[a]ll complaints are to be immediately reported to the Regional Manager and to Support Center Human Resources." (Id.) The next section is titled "Sexual Harassment Policy" and a subsection titled "Responsibility" states "All Team Members' Responsibilities (both hourly and management)" include the following: "If you have been the victim of harassment by anyone at RARE Hospitality International, Inc. for any reason, you must immediately tell your supervisor or Support Center Human Resources." (Id. at 25.) Zeuner received a copy of the Management Handbook and was aware of the policies. (Zeuner Dep. Ex. 2.) Rare Hospitality argues this policy required Zeuner to report sexual harassment to either Larson or the Human Resources Department, and a failure to do so kept the company unaware of any such behavior. (Def.'s Br. Support Mot. Summ. J. at 19–

20.) Zeuner admits she knew Krawiec's behavior was sexual harassment, but she never reported it to Larson or to the corporate office in Atlanta. (Zeuner Dep. at 129–30.)

Zeuner contends Plato and Larson had both actual and constructive knowledge of Krawiec's behavior. (Pl.'s Br. Resp. Def.'s Mot. Summ. J. at 19.) The Plaintiff produces evidence that Plato knew of certain aspects of Krawiec's behavior. Plato admits he knew of two incidents in which Krawiec became hostile toward Zeuner: the time clock incident when Krawiec punched the wall near Zeuner's head and the night of January 25. (Plato Dep. at 41–42, 46–47.) Plato never reported the first incident or disciplined Krawiec in any official way (the second incident spurred the events leading to Zeuner's termination). (*Id.* at 42–43.) Zeuner says she told Plato weekly that Krawiec was a "horrible employee" and "[h]e needs to go." (Zeuner Dep. at 68.) When Krawiec was transferred from cook to server, Zeuner told Plato that she was uncomfortable working with Krawiec "because of his mannerisms." (*Id.* at 65.) Employees Wendy McCarter and Shawn Earnhardt say Plato was aware of the problems with Krawiec. (McCarter Aff. ¶ 4; Earnhardt Aff. ¶ 10.) Nelson Cabrera, an assistant manager, affirms that "Plato was very aware of the problems with Gene [Krawiec] but chose not to act on them." (Cabrera Aff. ¶ 8.) Some employees at LongHorn witnessed Plato with Krawiec "discussing [lewd] and sexual comments" about customers and employees. (Plato Dep. Ex. 4 at 17–18.) This evidence shows that Plato was aware of problematic, and perhaps hostile, conduct. Plato denies witnessing any inappropriate behavior by Krawiec, nor does he remember reports of inappropriate behavior from Zeuner or other employees. (Plato Dep. at 58–65, 73–78.)

Plato may have had some affirmative duty to follow up on the incidents he did know about. Regional Vice President John Alexander spoke with Plato after the January 25 incident and Zeuner's termination "about his responsibility as the general manager in the restaurant, to ... be aware of any inappropriate behavior that goes on in the restaurant." (Alexander Dep. at 89.) Alexander told Plato "he had a responsibility to not allow inappropriate behavior to take place ... that Patrick would have a responsibility to step in and get involved." (*Id.* at 89.) These statements could indicate that Plato had more affirmative duties than simply reporting up the chain when formal reports were made to him, and should have investigated Zeuner's reports more thoroughly.

There is little in the record to indicate that higher-level managers were aware of Krawiec's conduct. Larson says she did not learn about it until Zeuner complained on January 28, 2003 (Larson Dep. at 26), and Zeuner does not remember reporting Krawiec's behavior to Larson (Zeuner Dep. at 70). Alexander did not know of any allegations that Krawiec was sexually harassing employees or creating a hostile work environment until after the January 25 incident was reported to him. (Alexander Dep. at 32, 80.) Jones was never told "about any sexually offensive conduct involving Gene Krawiec." (Jones Aff. ¶ 16.) Zeuner does not put forth evidence to refute these statements.

■ On balance, there is sufficient evidence in the record on which a jury could conclude that Rare Hospitality was negligent. There is enough evidence on which a reasonable jury could find Plato had actual knowledge of Krawiec's behavior. He admits knowledge of a significant altercation involving Krawiec, and other employees indicate he was "aware" or "very

aware" of the "problems," and may even have participated in some of the inappropriate behavior. There is also evidence on the record indicating Plato's knowledge should be imputed to Rare Hospitality. The Management Handbook indicates reports of harassment could be directed to a number of employees in addition to Larson and the Human Resources Department, including a store manager and the employee's supervisor. The Handbook states that victims of harassment should "immediately tell *your supervisor or* Support Center Human Resources" and that complaints should be directed to "*a store manager,* your Regional Manager, *or* the Human Resources Department." (Zeuner Dep. Ex. 1 at 24–25 (emphasis added).) Thus, Zeuner's complaints to Plato could be deemed sufficient to notify Rare Hospitality of any problems.

Because there is evidence on which a reasonable jury could find Rare Hospitality liable to Plaintiff for sexual harassment by its employee Krawiec, the Defendant's Motion for Summary Judgment will be denied.

### E. Retaliation

Zeuner also alleges that Rare Hospitality terminated her in retaliation for reporting sexual harassment by Krawiec, in violation of Title VII. (Compl. ¶ 47.) In its Motion for Summary Judgment, Rare Hospitality argues that this claim did not appear in Zeuner's EEOC filing and so is procedurally barred because it is beyond the scope of any ensuing lawsuit. (Def.'s Br. Support Mot. Summ. J. at 7–9.) Because the court finds Plaintiff's retaliation claim to be outside the scope of her EEOC filing, Defendant's motion on this claim will be granted.

Title VII plaintiffs are required to exhaust administrative remedies with the EEOC before filing a complaint in federal court. *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 247 (4th Cir.2000). The EEOC filing limits a plaintiff's right to bring suit by defining the scope of any ensuing lawsuit. *Id.* One purpose of the EEOC filing requirement is "to put the charged party on notice of the claims raised against it." *Sloop v. Memorial Mission Hosp., Inc.,* 198 F.3d 147, 149 (4th Cir.1999). A plaintiff may only maintain in her Title VII lawsuit "those discrimination claims stated in the initial [EEOC] charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 963 (4th Cir.1996). Where a plaintiff alleges the same theory of recovery but relies on different supporting facts in the subsequent complaint, the complaint is "reasonably related" to the EEOC charge. *See, e.g., Smith,* 202 F.3d at 248 (holding that a retaliation claim based on the company's chastisement and threats of termination was "reasonably related" to a retaliation claim based on the company forcing the plaintiff to continue working with the alleged sexual harasser and refusing her transfer when the claim resulted from management's reaction to her complaints of harassment). When a plaintiff alleges a different theory of recovery in the EEOC filing and in the subsequent lawsuit, the claims are not "reasonably related." *See, e.g., Evans,* 80 F.3d at 963–64 (holding that plaintiff's claims of sexual harassment, pay and benefits discrimination, and age discrimination did not relate to her EEOC filing, which alleged only failure to promote based on sex discrimination); *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995) (holding that claims of discrimination in hiring, training, and promotion were outside the scope of the EEOC filing,

which alleged only disparate disciplinary treatment).

Zeuner's claim with the EEOC described the actions taken against her which she felt were discriminatory:

> I was a mgr, we had a very large male server who was rude, derogatory, got in wemon's [sic] face screaming and pointing at them including me. We finally after 4 mths got the general manager to back us and fire him. When he found out he was fired he fabricated a sexual harassment suit against me to the Corp. office and stated if they did not fire me and hire him back he was going to sue. He had 1 or 2 people to corroborate [sic] his story, when I had 15 or more and they fired me and hired him back!

(Zeuner Dep. Ex. 8.) The form asks, "Do you believe this action was taken against you because of your?" and provides several options: "Race, Color, Gender ... Retaliation, Other reason: _____ (Be Specific)." Zeuner checked "Other reason" and explained "to keep from being sued." (*Id.*) She did not check the "Retaliation" item. In a form signed the next day, the details of Zeuner's charges are described as follows:

> Beginning in or about mid-August 2002, I and several other female employees were subjected to a hostile work environment from a male server. The male server created a hostile work environment by yelling at us, cussing us, getting into our faces and by punching walls and equipment. He did not subject the male employees to these working conditions. I complained about this employee's conduct to the General Manager on separate occasions, the last occasion being January 25, 2003. It was not until my last complaint that the company decided to take action and terminate this em-

ployee. Subsequent to this employee being advised of his termination, he fabricated allegations of sexual harassment against me which led to his rehiring and to my termination on January 31, 2003.

> I was terminated due [sic] this employee's allegations of sexual harassment. I deny that I sexually harassed this employee in any way. His allegations were fabricated against me to get me terminated and to get his job back. The General Manager (male) has been accused of sexual [sic] harassing a female employee. However, the General Manager was not discharged.

(*Id.* Ex. 9.) On this form, the only option checked in the section titled "Discrimination based on" is "Sex." A few weeks later, Zeuner added a charge of pregnancy discrimination. (*Id.* Ex. 10.)

▮ Taken as a whole, Zeuner's EEOC filing does not fairly raise any claim of retaliation. The EEOC filings do not explicitly state a claim of retaliation, nor does one follow by inference or investigation of the particulars of this complaint. Zeuner states that Krawiec retaliated against her by accusing her of sexual harassment, but she nowhere implies that Rare Hospitality's actions were in retaliation for her complaints about Krawiec. She says the company's reaction to her complaints about Krawiec was the eventual decision to terminate *Krawiec*,[13] not her, and admits she "was terminated due [sic] this employee's allegations of sexual harassment." Nowhere in the EEOC charge does she allege that her complaints were the cause of her own termination.

▮ Even if Zeuner's retaliation claim were within the scope of her EEOC filing, the claim would fail because Zeuner has put forth no evidence on causation. To

13. As previously described, Krawiec was suspended and transferred, but not fired.

prevail on a Title VII retaliation claim, a plaintiff must satisfy the burden of proof framework established in *McDonnell Douglas*. To establish a prima facie case of retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action by her employer; and (3) a causal connection existed between the protected activity and the adverse action. *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.2004). Rare Hospitality's contention that it terminated Zeuner because it found corroborated claims of sexual harassment by her are unanswered. Zeuner denies Krawiec's allegations but does not deny this was the cause of her termination. When asked specifically about the retaliation claim, Zeuner responds only by alleging that she was discriminated against because of sex and pregnancy. (*See* Zeuner Dep. at 132–38.) There is insufficient evidence to satisfy the prima facie element of causation.

The Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim will be granted.

## III. CONCLUSION

In conclusion and for the reasons stated herein,

IT IS ORDERED that Defendant's Motion for Summary Judgment [11] is **GRANTED** as to Plaintiff's retaliation claim and **DENIED** as to Plaintiff's sex discrimination, pregnancy discrimination, and sexual harassment claims.